IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ROYCE C. GOUVEIA, | ) | Civ. No. 17-00021 SOM/KJM |
| | ) | |
| Petitioner, | ) | |
| | ) | ORDER GRANTING HABEAS |
| vs. | ) | PETITION |
| | ) | |
| NOLAN ESPINDA, Director of | ) | |
| the Department of Public | ) | |
| Safety for the State of | ) | |
| Hawaii; and DOUG CHIN, | ) | |
| Attorney General of the State | ) | |
| of Hawaii, | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

**ORDER GRANTING HABEAS PETITION**

I.          **INTRODUCTION.**

          Petitioner Royce C. Gouveia is scheduled to be retried in state court for manslaughter.  The Hawaii state courts have determined that his double jeopardy rights will not be violated by a retrial.  Gouveia now seeks relief from this court, arguing that the Double Jeopardy Clause of the federal Constitution forbids the upcoming trial.

          Gouveia was tried in state circuit court for manslaughter in violation of section 707-702(1)(a) of Hawaii Revised Statutes.  After the jury had reached a verdict, but without reading the verdict, the state trial judge declared a mistrial.  The judge ruled that the jury deliberations and verdict were tainted by the jurors' concern about their personal safety, given their comments about a glaring man in the audience

during trial.  The trial judge sealed the verdict without opening it and concluded that a mistrial was supported by manifest necessity.  In the trial judge's opinion, nothing short of a mistrial could cure the effect of the menacing man, and Gouveia's double jeopardy rights would not be violated by a retrial on the manslaughter charge.

On appeal, the Intermediate Court of Appeals of the State of Hawaii ("ICA") opened the sealed verdict and learned that the jury had voted to acquit Gouveia of the charges.  The ICA then affirmed the trial court.  The Hawaii Supreme Court granted certiorari and also affirmed.  This habeas petition followed.

Gouveia asserts that, given the acquittal, any retrial would violate his Fifth Amendment right not to be placed in double jeopardy.  Gouveia also argues that the mistrial declaration was not supported by manifest necessity.  This court determines that the verdict of acquittal was not final at the time a mistrial was declared, but concludes that a mistrial was not manifestly necessary.  This court therefore grants Gouveia's habeas petition, ruling that a retrial would violate his federal double jeopardy rights.

## II.        BACKGROUND FACTS.

Gouveia was indicted in October 2012 for allegedly having committed manslaughter in violation of section 707-702(1)(a) of Hawaii Revised Statutes.  Trial commenced in state court on Tuesday, September 3, 2013, with jury selection, preliminary instructions, and opening statements.  By Friday, September 6, 2013, the jury was instructed, closing arguments were presented, and the jury began deliberations.  *See* Docket Sheet, available through eCourt KōKua on the Hawaii State Judiciary website, [www.courts.state.hi.us](www.courts.state.hi.us) (input CaseID 1PC121001474 under "Case Search" after entering eCourt KōKua) (last visited August 15, 2017).

In the afternoon of September 6, 2013, the jury sent simultaneous notes to the court.  In Communication No. 3 From the Jury, which indicates that it was signed at 2:20 p.m., the jury indicated, "We reached a verdict."  ECF No. 3, PageID # 56. Communication No. 2 From the Jury indicates that, notwithstanding being numbered "2," it was actually signed at 2:24 p.m., after the later-numbered Communication No. 3 had been signed. Communication No. 2 stated, "Concern.  This morning on prosecutor's side of courtroom there was a man, shaved head, glaring and whistling at defendant.  We have concern for our safety as jurors."  ECF No. 3, PageID # 58.

The parties convened in open court to discuss the
notes.  The trial judge stated:

> My intention, unless counsel, you know, can
> persuade me otherwise, is just to take no
> action on this, take the verdict, and then
> I'm going to do what I normally do, which is
> ask them if I can come in and talk to them
> right afterwards and then address this with
> them basically one-on-one, meeting with them
> in private after we take the verdict and
> formally stand adjourned.

ECF No. 13-3, PageID # 349.

At that point, the parties asked that the jurors be
individually voir dired about Communication No. 2.  *See id.*  The
following table is a summary of the individual juror voir dire.

| Juror | Saw Man Glaring and Whistling at Gouveia? | Was Incident Talked About During Deliberations? | Any Concern For Safety? | Any Bearing on Decision? |
|-------|-------------------------------------------|------------------------------------------------|-------------------------|--------------------------|
| Mr. Valencia | No. (PageID # 353) | Yes.  For a few minutes at the end.  (PageID # 354) | Not concerned for own safety. (PageID # 355); discussion related to jurors' concern for their safety.  (PageID # 356) | No. (PageID # 355) |
| Ms. Wilcox | No. (PageID # 358) | Yes. In the beginning for about 5 minutes. (PageID # 358-59); <br><br>Also, brought up after verdict was reached. (PageID # 361) | A few jurors said they were a little bit scared.  (PageID # 360) | No. (PageID # 360) |

| Ms. Boehm | Yes. Heard whistling from prosecutor's side. (PageID # 369) | No. Only after the verdict was reached. (PageID # 365) | A few of the jurors expressed concern for their safety. (PageID #s 366 and 370) | No. (PageID # 367) |
|---|---|---|---|---|
| Ms. Foster | Yes. (PageID #s 373 and 376) | No. After the verdict was reached. (PageID #s 373 and 375) | Yes. Had concern for own safety. (PageID #s 374 and 377) | No. (PageID # 373-74) |
| Ms. Hanashiro | No. (PageID # 381) | Yes. As soon as deliberations started for about 10 minutes. (PageID #s 382-84); Also brought up towards the end. (PageID # 387) | Yes. Jurors were slightly intimidated and concerned. (PageID # 386) | No. (PageID # 383) |
| Ms. Li | Yes. (PageID # 388) | Yes, in the "middle-early" of deliberations and again at the end. (PageID # 389) | Was not concerned when she saw it. But there was concern after the verdict. (PageID # 392) | No. (PageID #s 390-91) |
| Juror #7 (unidentified but referred to as Ms. Li when excused, although apparently not the same person as the preceding juror) | Yes. (PageID # 393) | Yes. Toward end of deliberations for a few minutes. (PageID # 394) | Was not concerned for herself. (PageID # 393) | No. (PageID #s 394-95) |

| | | | | |
|---|---|---|---|---|
| Mr. Chandler | No. (PageID # 406) | Yes. For a minute or so when jurors went to deliberate, and then again after verdict had been reached. (PageID # 407) | Jurors did not seem scared. (PageID # 408) | No. (PageID # 407) |
| Mr. Masuno | No. (PageID # 410) | No, only after verdict reached. (PageID #s 411-12) | There was concern for the safety of some of the female jurors. (PageID #s 414-15) | No. (PageID # 413) |
| Ms. Mau | No. (PageID # 417) | No. (PageID # 417) | No. (PageID # 417) | No. (PageID # 417) |
| Ms. Kama | No. (PageID # 422) | Yes. At the end and after verdict reached. (PageID #s 422, 425) | Yes. Jurors were concerned. (PageID # 426) | Yes. Jurors were concerned about their safety such that it impacted their decision. (PageID # 426) |
| Ms. Chun | No. (PageID # 428) | Yes, as soon as jurors went into the deliberation room or the "early middle." (PageID #s 430-31) | | No. (PageID #s 429-30) |

At the conclusion of the individual juror voir dire, the trial judge noted that the verdict was unknown and asked defense counsel if Gouveia was moving for a mistrial. ECF No.

6

13-3, PageID # 435.  Gouveia did not make such a motion, but the
prosecution did.  *Id.*

     After hearing argument, the trial judge repeated that
there was no way of knowing what the verdict was, but indicated
that it was "pretty clear . . . what everybody thinks the verdict
is."  *Id.*, PageID # 451.  He stated that, whatever the verdict
was, it was "immaterial" to his ruling on the mistrial motion.
*Id.*

     Based on the individual juror voir dire, the trial
judge determined that at least some of the jurors had a "really
serious concern for their personal safety."  He reasoned that
four or five of the jurors had stated that the subject came up as
one of the first things in the deliberation room.  Other
testimony supported that impression, including Ms. Kama's
statement that the situation affected deliberations.  *Id.*, PageID
# 452.  The judge stated, "It frankly beggars my reason and
common sense that it would have no bearing on the deliberations
in this case and therefore the verdict."  *Id.*  He then declared a
mistrial based on "manifest necessity," sealing the verdict for
future purposes without ever determining what the verdict
actually was.  *Id.*  He did not find credible the eleven jurors
(other than Ms. Kama) who said that the glaring man had not
affected the verdict, given the statements by at least three or

four of them that they had concerns for their safety.  *Id.*,
PageID #s 452-53.

On October 22, 2013, the trial judge followed up his
oral ruling with written Findings of Fact, Conclusions of Law and
Order Granting State's Oral Motion for Mistrial Based on Manifest
Necessity.  ECF No. 13-3, PageID #s 172-77.  He made the
following findings of fact:

> 7. The Court questioned the jurors
> individually and both counsel for the State
> and for Defendant were given adequate
> opportunity to question each juror regarding
> Communication No. 2.
>
> 8. Four jurors witnessed an individual seated
> on the prosecutor's side of the courtroom
> whistling and/or glaring at Defendant
> ("incident") prior to commencing
> deliberation.
>
> 9. Seven of the jurors indicated discussion
> of the incident occurred before the verdict,
> ranging from within ten minutes of commencing
> deliberation to the end of deliberation.  At
> least four of these seven jurors indicated
> discussion of the incident occurred at the
> beginning of deliberations, specifically that
> it was one of the first topics discussed.
>
> 10. During the discussion of the incident
> prior to verdict, the jurors who actually
> observed the incident communicated to the
> other jurors fear for their own safety.
>
> 11. Some of the juror answers regarding
> Communication No. 2 and the incident included
> the following:
>
>> a. Some jurors were worried about
>> retaliation;

b. The unidentified male's look appeared hostile during the incident;

c. Some jurors were concerned;

d. Some jurors felt intimidated; and

e. The incident impacted other jurors' decisions.

12. Although all twelve jurors indicated that neither the incident itself nor the discussion regarding the incident during the deliberations affected their own decision, at least one juror indicated that the incident appeared to have impacted the deliberation process and decision.

13. The incident was not part of the evidence in the case at hand.

14. The verdict was never taken for this case. At no point during the proceedings did the Court take, read or otherwise get any indication of the jury's verdict.

15. The Court finds that the jurors' statements that the incident did not affect their decisionmaking process and/or deliberations are not credible as evidenced by the plain language of Communication No. 2 and answers of the voir dire of each individual juror.

16. The Court further finds that the concern for personal safety as expressed by the jurors had an impact on the jurors' decisions based on the totality of the circumstances present and thus its effect on the subsequent verdict was not harmless beyond a reasonable doubt.

ECF No. 13-3, PageID #s 173-75.

The trial judge concluded that, although no juror said that the glaring man had affected his or her own decisionmaking process, "reason and common sense dictates that the incident did

9

have an effect on the deliberations hence the impartiality of the jurors, which [wa]s not harmless beyond a reasonable doubt." *Id.*, PageID # 176. Accordingly, the trial judge ruled that the jury had not impartially deliberated on a verdict. *Id.* The trial judge stated that there was no remedy short of declaring a mistrial "as neither a continuance nor a further jury instruction would appropriately address the issue of an impartial jury and its subsequent tainted verdict." *Id.* He said that the bar on double jeopardy did not preclude Gouveia's retrial because, based on the totality of the circumstances, there was a "manifest necessity" for the mistrial, which he defined as a sudden and overwhelming emergency beyond the control of the court that was unforeseeable and made it no longer possible to conduct the trial or to reach a fair result. *Id.*, PageID # 177.

On December 19, 2013, following the mistrial declaration, the trial court denied Gouveia's motion to dismiss the charges based on double jeopardy. *See* Appeal From the Order Denying Motion to Dismiss for Violation of Double Jeopardy on December 19, 2013. ECF No. 13-3, PageID # 148. Gouveia appealed, arguing in his Opening Brief to the ICA that (1) the trial court had erred in declaring a mistrial (PageID #s 160-66); and (2) the trial court had erred in denying the motion to dismiss based on the violation of Gouveia's double jeopardy

rights under the United States and Hawaii constitutions (PageID #s 166-67).

On April 30, 2015, the ICA, in a 2-1 decision, affirmed the trial court's rulings, holding that, because the trial judge had not abused his discretion in finding a manifest necessity to declare a mistrial, Gouveia's constitutional right to be free of double jeopardy would not be implicated in any retrial. *See Hawaii v. Gouveia*, 135 Haw. 219, 348 P.3d 496, 2015 WL 2066780 (Ct. App. Apr. 30, 2015). The ICA unsealed the verdict, in which the jury had found Gouveia not guilty. 2015 WL 2066780, *7; ECF No. 8, PageID # 104 (copy of verdict).

On July 2, 2015, Gouveia sought a writ of certiorari from the Hawaii Supreme Court. *See* ECF No. 13-3, PageID # 228. Gouveia again argued that the trial court had erroneously granted the motion for mistrial. PageID #s 232-235. He contended, "As previously argued, the trial court's finding of manifest necessity was erroneous. Therefore the denial of Gouveia's Motion to Dismiss for Violation of Double Jeopardy and the ICA's ruling affirming the denial were erroneous." PageID # 235.

The Hawaii Supreme Court granted certiorari. *See* 2015 WL 4756475 (Haw. Aug. 10, 2015). On October 26, 2016, the Hawaii Supreme Court affirmed in a 4-1 decision. *See* 139 Haw. 70, 384 P.3d 846 (2016).

On January 18, 2017, Gouveia filed the present petition. *See* ECF No. 1.

**III.    STANDARD OF REVIEW.**

Gouveia originally requested relief under the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), which provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Respondents correctly argue (and Gouveia concedes) that § 2254(d) is inapplicable because Gouveia is not currently "in custody pursuant to the judgment of a State court." There is no judgment against him at all. Instead, his case is set to be retried.

But while the absence of a state judgment renders § 2254 inapplicable, it does not leave Gouveia without a federal avenue for challenging his retrial. This court reviews Gouveia's

petition under 28 U.S.C. § 2241, which provides federal courts with a general grant of habeas authority. *See Frantz v. Hazey, 533 F.3d 724, 735* (9th Cir. 2008) (en banc).

An example of precisely this approach is found in *Stow v. Murashige*, 389 F.3d 880, 885 (9th Cir. 2004), a case that involved the present judge and the same attorney for a petitioner. In *Stow*, a double jeopardy claim had similarly been asserted under § 2254. Noting that the petitioner was not "in custody pursuant to the judgment of a State court" at the time he filed his petition, the Ninth Circuit stated that the threshold requirement for § 2254 had not been satisfied. *Id.* Instead of denying the § 2254 petition on that basis, the Ninth Circuit recognized that the petitioner had raised a double jeopardy challenge to his retrial that could be "properly treated under § 2241," which allows for pretrial habeas challenges. *Id.* at 885 and 888; *accord Harrison v. Gillespie*, 640 F.3d 888, 896 (9th Cir. 2011) ("Our precedent makes clear that 28 U.S.C. § 2241 is the proper vehicle for asserting a double jeopardy claim prior to (or during the pendency of) a successive trial."). This court construes Gouveia's § 2254 petition as a § 2241 petition. This court has allowed supplemental briefing to alleviate any possible prejudice to Respondents relating to consideration of Gouveia's habeas petition as one under § 2241.

Section 2241 does not require a petitioner to be in custody pursuant to a state judgment, but it does require a petitioner to be in custody. Citing *Wilson v. Belleque*, 554 F.3d 816, 821 (9th Cir. 2009), which noted that "'custody' is a jurisdictional prerequisite to habeas review under § 2241(c)(3)," Respondents argue that Gouveia is not "in custody" such that § 2241 applies. *See* ECF No. 18, PageID # 573-74. This court is not persuaded.

Gouveia is on "supervised release" in the state system, which, unlike "supervised release" in the federal system, occurs pretrial. Gouveia is, in essence, equivalent to a federal defendant who is subject to pretrial release conditions monitored by a United States Pretrial Services Officer.

As *Belleque* recognizes, "custody" is defined broadly and "has not been restricted to situations in which the applicant is in actual, physical custody." *Id.* at 822 (quotation marks and citation omitted). Instead, the "custody" requirement is satisfied when there is a "significant restraint" on a person's liberty that is not shared by the public generally. *Id.* The Ninth Circuit has noted that the custodial requirement has been met in cases involving prisoners released on parole, on their own recognizance, and free on bail. *Id.*

It is undisputed that Gouveia must comply with restrictive conditions. *See* ECF No. 16-1, PageID #s 495-96.

These conditions govern where he may reside, with whom he may have contact, his consumption of alcohol, his attendance at substance abuse treatment at his expense, employment, an extradition waiver, and his possession of dangerous weapons, firearms, or ammunition. *Id.*, PageID #s 497, 500-01. These are substantial conditions that are not imposed on the public generally. The totality of the conditions renders Gouveia in "custody" for purposes of § 2241.

A petition under § 2241, unlike one under § 2254, is not subject to the heightened standards set forth in 28 U.S.C. § 2254(d). *Stow*, 389 F.3d at 886. Habeas relief is proper under § 2241 when the petitioner shows that a retrial would violate his or her Fifth Amendment right against double jeopardy. The § 2241 petitioner need not show that the state court decision was contrary to or an unreasonable application of clearly established federal law, as required by § 2254(d). *Id.* at 888. In examining Gouveia's petition under § 2241, this court therefore focuses on whether his double jeopardy right would be violated by the scheduled retrial.

**IV.     THERE IS NO JURISDICTIONAL, PROCEDURAL, OR OTHER HURDLE TO THIS COURT'S CONSIDERATION OF THE DOUBLE JEOPARDY ISSUE.**

     **A.     The *Rooker-Feldman* Doctrine is Inapplicable.**

In its Supplemental Memorandum of July 31, 2017, Respondents argue that this court lacks jurisdiction pursuant to the *Rooker-Feldman* doctrine.  *See* ECF No. 18.  That argument lacks merit.

As a general principle, this court may not exercise appellate jurisdiction over state court decisions.  *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482-86 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923).  This rule, commonly known as the *Rooker-Feldman* doctrine, bars a losing party in state court from seeking what amounts to appellate review of the state-court judgment in federal court based on the losing party's claim that the state judgment itself violates the loser's federal rights.  *See Bennett v. Yoshina*, 140 F.3d 1218, 1223 (9th Cir. 1998).

However, it is well settled that the *Rooker-Feldman* doctrine is inapplicable to cases seeking habeas corpus relief.  *See In re Gruntz*, 202 F.3d 1074, 1079 (9th Cir. 2000) ("It is well-settled that the Rooker–Feldman doctrine does not touch the writ of habeas corpus."); *Martin v. Virga*, 2012 WL 1622663, *2 (N.D. Cal. May 9, 2012) ("regardless of the *Rooker–Feldman* doctrine, a federal court has jurisdiction to consider a habeas

corpus petition which, in effect, is a challenge to the final judgment of a state court in a criminal action").

### B. *Younger* **Abstention is Inapplicable.**

Respondents' Supplemental Memorandum also argues that this court should abstain from this matter pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), which "forbids federal courts from unduly interfering with pending state court proceedings that implicate important state interests." *Potrero Hills Landfill, Inc. v. City of Solano*, 657 F.3d 876, 881 (9th Cir. 2011) (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982) (quotation marks omitted)). This argument is also unpersuasive.

In *Younger*, the Supreme Court held that a federal court may not interfere with a pending criminal prosecution absent extraordinary circumstances. *Logan v. United States Natl. Ass'n*, 722 F.3d 1163, 1167 (9th Cir. 2013). This principle has been extended to interference with some civil cases. *Id. Younger* abstention applies when there is a state proceeding that is (1) ongoing; (2) implicates important state interests; and (3) provides an adequate opportunity to raise federal questions; and (4) when the federal action would enjoin the state proceeding or have the practical effect of doing so. *Id.* But a double jeopardy claim is an exception to the *Younger* abstention doctrine. *Wilson v. Czerniak*, 355 F.3d 1151, 1157 (9th Cir.

2004) ("double jeopardy claims present an exception to the general rule requiring federal courts to abstain from interfering with pending state proceedings"); *Mannes v. Gillespie*, 967 F.2d 1310, 1312 (9th Cir. 1992) (same); *Schillaci v. Peyton*, 328 F. Supp. 2d 1103, 1105 (D. Haw. 2004) (same).  Accordingly, *Younger* abstention is inapplicable.

### C.  **Gouveia Exhausted His Double Jeopardy Claim**.

"As a prudential matter, courts require that habeas petitioners exhaust all available judicial and administrative remedies before seeking relief under § 2241."  *Ward v. Chavez*, 678 F.3d 1042, 1045 (9th Cir. 2012).  Citing *Cooper v. Neven*, 641 F.3d 322, 326-27 (9th Cir. 2011), Respondents argue that Gouveia failed to exhaust his double jeopardy claim by presenting it to the highest court of Hawaii.  *See* ECF No. 18, PageID # 574.  This court disagrees.

Gouveia filed a motion to dismiss on Hawaii and federal double jeopardy grounds with the trial court.  When the trial court denied that motion, he appealed that denial to the ICA, contending that his Hawaii and federal rights to be free of double jeopardy had been violated and that the trial court had abused its discretion in determining the mistrial was supported by manifest necessity.  *See Gouveia*, 2015 WL 2066780, at *11. After the ICA affirmed, Gouveia sought a writ of certiorari from the Hawaii Supreme court, arguing that the ICA ruling was

erroneous.  ECF No. 13-3, PageID # 235 ("As previously argued,
the trial court's finding of manifest necessity was erroneous.
Therefore, the denial of Gouveia's Motion to Dismiss for
Violation of Double Jeopardy and the ICA's affirming the denial
were erroneous.").  Gouveia properly exhausted his Fifth
Amendment double jeopardy claim.

This court does not agree with Respondents that Gouveia
failed to properly exhaust his remedies because he did not
present the "operative facts" to the Hawaii Supreme Court.
*See* ECF No. 18, PageID # 575-77.  Respondents make no suggestion
that Gouveia failed to present the "operative facts" to the ICA.
*Id.*  In fact, Gouveia expressly argued to the ICA with references
to relevant facts that the mistrial declaration was not supported
by manifest necessity and that the trial court had erroneously
denied Gouveia's motion to dismiss on state and federal double
jeopardy grounds.  *See* ECF No. 13-3, PageID # 165-67 (arguing
that the verdict was untainted, that the trial court let the jury
reach a verdict but refused to take it, and that retrial was
barred because the mistrial declaration was not supported by
manifest necessity).

In his application for a writ of certiorari from the
Hawaii Supreme Court, Gouveia argued that each juror had been
impartial in his or her decisionmaking process and that the
jurors' individual verdict determinations had not been improperly

influenced.  *See* ECF No. 13-3, PageID #s 228, 234.  Gouveia then
relied on Chief Judge Craig Nakamura's dissent in the ICA
decision.  *See id.*, PageID # 235.  That dissent stated, "In my
view, the Circuit Court of the First Circuit (Circuit Court)
abused its discretion in concluding that manifest necessity
existed for a mistrial."  *Hawaii v. Gouveia*, 2015 WL 2066780, *11
(Ct. App. Haw. Apr. 30, 2015).  Chief Judge Nakamura noted that
the "jurors' expression of concern for their personal safety due
to the incident did not automatically or necessarily mean that
the jurors would be incapable of rendering a fair and impartial
decision."  2015 WL 2066780 at *13.  Chief Judge Nakamura
disagreed with the trial judge's determination of manifest
necessity, which was based on the jurors' expressed concerns for
their personal safety.  *Id.* at *12 to *13.  The certiorari
application also argued that, because manifest necessity was
lacking, reprosecution was barred by double jeopardy and that the
trial court had erroneously denied Gouveia's motion to dismiss
based on double jeopardy grounds.  ECF No. 13-3, PageID # 235.
Under these circumstances, it cannot be said that Gouveia failed
to adequately raise to the Hawaii Supreme Court the very double
jeopardy claim he raises here.

**V.      DOUBLE JEOPARDY ISSUE.**

**A.   Legal Background.**

### 1.   The Double Jeopardy Clause Prohibits a Retrial After an Acquittal.

In relevant part, the Fifth Amendment to our nation's Constitution, known as the Double Jeopardy Clause, declares "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb."  This Double Jeopardy Clause provides three related protections: (1) it prohibits a second prosecution for the same offense after acquittal; (2) it prohibits a second prosecution for the same offense after conviction; and (3) it prohibits multiple punishments for the same offense.  *See United States v. Wilson*, 420 U.S. 332, 343 (1975).  At issue here is the first of these protections, which the Supreme Court in *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977), characterized as "[p]erhaps the most fundamental rule in the history of double jeopardy jurisprudence."

The policy behind the Double Jeopardy Clause "is the concern that permitting the sovereign freely to subject the citizen to a second trial for the same offense would arm Government with a potent instrument of oppression."

> The Clause, therefore, guarantees that the State shall not be permitted to make repeated attempts to convict the accused, "thereby subjecting him to embarrassment, expense and

> ordeal and compelling him to live in a
> continuing state of anxiety and insecurity as
> well as enhancing the possibility that even
> though innocent he may be found guilty."

*Martin Linen*, 430 U.S. at 569 (quoting *Green v. United States*,
355 U.S. 184, 187-188 (1957)); *see United States v. Bates*, 917
F.2d 388, 392 (9th Cir. 1990) ("Criminal defendants have a right
to have the jury first impaneled to try them reach a verdict.").
The Supreme Court has noted that "the protection of the Double
Jeopardy Clause by its terms applies only if there has been some
event, such as an acquittal, which terminates the original
jeopardy." *Richardson v. United States*, 468 U.S. 317, 325
(1984).

The Double Jeopardy Clause's protection against retrial
for the same offense was at issue in *Ball v. United States*, 163
U.S. 662, 671 (1896), which involved a murder charge brought
against three men.  A jury found two of the defendants guilty but
acquitted the third, Millard F. Ball.  The trial court discharged
Ball and judged the other two defendants guilty, sentencing them
to death.  *Id.* at 664.  The convictions of the two defendants
were reversed on appeal because the indictment was insufficient.
*Id.* at 664-65.  Despite Ball's acquittal in the first trial, all
three defendants were reindicted.  Over objections by all of the
defendants based on double jeopardy, all three were then retried
and convicted of murder.  *Id.* at 665-66.  The Supreme Court held
that, because Ball had already been acquitted, his retrial

violated the Double Jeopardy Clause. Id. at 669-71. The retrial of the other two defendants, by contrast, did not violate the Double Jeopardy Clause. *Id.* at 672.

*Martin Linen* also involved the first double jeopardy protection. After the jury was deadlocked and discharged, the trial court entertained motions for judgment of acquittal, then entered judgments of acquittal. 430 U.S. at 565-67. The issue before the Supreme Court was whether the government could appeal the judgments of acquittal. The Court began its examination of the issue by noting that the Double Jeopardy Clause was implicated "only when the accused has actually been placed in jeopardy." *Id.* at 569. Jeopardy attaches when the jury is empaneled and sworn, or, in the case of a bench trial, when the judge begins to receive evidence. *Id.* The Supreme Court noted that the Double Jeopardy Clause was not implicated when a government appeal would not lead to successive prosecutions. The government could, for example, appeal a post-conviction dismissal of an indictment, as a reversal would merely reinstate the conviction. *Id.* at 570. However, when a judgment of acquittal has issued, a reversal on appeal would require a new trial, or at least some other proceeding devoted to the resolution of factual issues going to the elements of the offense charged. Such a retrial would violate the Double Jeopardy Clause. *Id.*

The Supreme Court further explained in *Fong Foo v. United States*, 369 U.S. 141 (1962), that even an erroneous acquittal prevents a retrial. In *Fong Foo*, the trial court directed the jury to return a verdict of acquittal because of prosecutorial misconduct and/or a lack of credible testimony. After a formal judgment of acquittal was entered, the government appealed, arguing that the judgment of acquittal should be vacated and the case retried. The First Circuit, concluding that the trial judge had not had the authority to direct a judgment of acquittal, set aside the acquittal and ordered a retrial. The Supreme Court reversed. Because the defendants had been tried under a valid indictment in a court with subject matter jurisdiction, and because the trial did not terminate before the entry of the judgment of acquittal, the Supreme Court held that, regardless of any trial court error in directing a judgment of acquittal for the defendants, they could not be retried without violating the Double Jeopardy Clause. *Id.* at 143.

   2.   **The Double Jeopardy Clause Prohibits a Retrial When A Mistrial Has Been Declared After Jeopardy Attaches Unless the Defendant Consents or the Mistrial Determination is Supported by Manifest Necessity.**

"Because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's valued right to have his trial completed by a particular tribunal." *Arizona v. Washington*, 434 U.S. 497, 503

24

(1978) (quotation marks and citation omitted).  The Supreme Court has recognized that there are multiple "circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." *Id.* at 505.  "If a case is dismissed after jeopardy attaches but before the jury reaches a verdict, a defendant may be tried again for the same crime only in two circumstances: (1) if he consents to the dismissal; or (2) if the district court determines that the dismissal was required by "'manifest necessity.'"  *United States v. Bonas*, 344 F.3d 945, 948 (9th Cir. 2003).

Given the importance of a person's right to be free of double jeopardy, a prosecutor must shoulder the "heavy burden" of demonstrating a "manifest necessity" justifying a mistrial over the objection of a defendant in order to retry that defendant without violating the Double Jeopardy Clause. *Id.*; *United States v. Dinitz*, 424 U.S. 600, 606-07 (1976).  The words "manifest necessity" "do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge."  *Arizona*, 434 U.S. at 506.

The Supreme Court has long recognized the trial court's discretion in making the manifest necessity determination:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

*United States v. Perez*, 22 U.S. 579, 580, 1824 WL 2694, at *1 (1824).

The degree of deference a trial judge has to declare a mistrial varies:

> The judge's decision should be strictly scrutinized when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused. At the other extreme, great deference should be accorded a trial judge's decision to discharge a jury which appears to be deadlocked.

*United States v. Sanders*, 591 F.2d 1293, 1296 (9th Cir. 1979)
(quotation marks and citations omitted). "A trial judge's
decision to declare a mistrial because of possible juror bias is
also deserving of great deference." *Id.* at 1297. "Nevertheless,
because the mistrial decision affects a constitutionally
protected right, reviewing courts have an obligation to satisfy
themselves that the trial judge exercised sound discretion in
declaring a mistrial." *Id.* (quotation marks, alterations, and
citations omitted); *accord* Arizona, 434 U.S. at 514 ("reviewing
courts have an obligation to satisfy themselves that . . . the
trial judge exercised 'sound discretion' in declaring a
mistrial").

It is with the legal backdrop of all the authorities
cited earlier in this order that this court turns to Gouveia's
specific arguments.

**B.  Gouveia Does Not Establish That This Court Should
Treat His Sealed Verdict As a Final Acquittal.**

The main focus of Gouveia's habeas petition is his
argument that, because the jury reached a unanimous determination
that he was not guilty of the offense charged, he was acquitted
for double jeopardy purposes. Respondents point to the failure
of the trial court to receive the verdict as critical to this
analysis. This court rules that when a verdict is not received
by a trial court, that verdict, even when it is an acquittal,

does not necessarily trigger the protection of the Double Jeopardy Clause.

The court recognizes that "what constitutes an 'acquittal' is not to be controlled by the form of the judge's action." *Martin Linen*, 430 U.S. at 571. Instead, whether a ruling is an acquittal turns on "whether the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *Id.* at 571; *accord Sanabria v. United States*, 437 U.S. 54, 71 (1978) (defining "acquittal" as "a resolution, correct or not, of some or all of the factual elements of the offense charged"). In other words, an acquittal encompasses "any ruling that the prosecution's proof is insufficient to establish criminal liability for an offense." *Evans v. Michigan*, 568 U.S. 313, 318 (2013). Under the circumstances presented here, Gouveia does not show that the verdict in his case was a final determination that he was innocent or that the prosecution failed to satisfy all of the elements of the manslaughter charge.

*Blueford v. Arkansas*, 566 U.S. 599, 132 S.Ct. 2044 (2012), is instructive. In *Blueford*, a one-year-old boy suffered fatal head trauma while at home with his mother's boyfriend, Blueford. 132 S. Ct. at 2048. Blueford was charged with capital murder and the lesser-included offenses of first-degree murder, manslaughter, and negligent homicide. *Id.* A few hours into the

28

deliberations, the jury sent a note that asked what would happen if it could not agree on a charge.  The court called the jury back into the courtroom, instructed the jury to deliberate further pursuant to *Allen v. United States,* 164 U.S. 492 (1896), and sent the jury back to deliberate.  About 30 minutes later, the jury sent out another note, this one stating that it could not agree "on any one charge in this case."  132 S. Ct. at 2049. The court then summoned the jury back into court and asked the foreperson to disclose the votes on each offense.  The foreperson indicated that the jury had unanimously agreed that Blueford was not guilty with respect to the capital murder and first-degree murder charges, but was divided nine to three on the manslaughter charge.  The foreperson told the court that the jury had not voted on the negligent homicide charge.  132 S. Ct. at 2049.  The court then gave another *Allen* charge and sent the jury back to deliberate.  When the jury could not reach a verdict, the court declared a mistrial.  *Id.*

Citing the foreperson's statement in open court that the jury had unanimously agreed to acquit Blueford of the capital murder and first-degree murder charges, Blueford sought dismissal of those charges on double jeopardy grounds.  *Id.*  The Supreme Court determined that the "foreperson's report was not a final resolution of anything."  132 S. Ct. at 2050.  The continuation

of deliberations demonstrated that the report could not have been final.  *Id.*  The Supreme Court gave an example:

> A jury enters the jury room, having just been given these instructions.  The foreperson decides that it would make sense to determine the extent of the jurors' agreement before discussions begin.  Accordingly, she conducts a vote on capital murder, and everyone votes against guilt.  She does the same for first-degree murder, and again, everyone votes against guilt.  She then calls for a vote on manslaughter, and there is disagreement.  Only then do the jurors engage in a discussion about the circumstances of the crime.  While considering the arguments of the other jurors on how the death was caused, one of the jurors starts rethinking his own stance on a greater offense.  After reflecting on the evidence, he comes to believe that the defendant did knowingly cause the death--satisfying the definition of first-degree murder.  At that point, nothing in the instructions prohibits the jury from doing what juries often do: revisit a prior vote.

132 S. Ct. at 2051.

Had this case been in federal court, the verdict clearly would not have been final for double jeopardy purposes before its contents were known to the trial judge and parties. The Ninth Circuit has held:

> Rule 31(d) [of the Federal Rules of Criminal Procedure] grants the judge or any party the absolute right to have the jury polled after it has returned its verdicts.  Although their jury room votes form the basis of the announced verdict, the jurors remain free to dissent from the announced verdict when polled.  In short, a jury has not reached a valid verdict until deliberations are over,

30

the result is announced in open court, and no
dissent by a juror is registered.

*United States v. Nelson*, 692 F.2d 83, 84–85 (9th Cir. 1982)

(internal citations and quotation marks omitted); *accord Harrison*

*v. Gillespie*, 640 F.3d 888, 899 (9th Cir. 2011) (en banc) ("the

verdict must be rendered by the jury in open court and accepted

by the court in order to become final"); *United States v. Boone*,

951 F.2d 1526, 1532 (9th Cir. 1991) ("A verdict is returned when

it is given by the jury to the judge in open court."); 3 C.

Wright and S Welling, *Fed. Practice and Procedure*, § 517 at 52

(2011) ("A verdict is valid and final when the deliberations are

over, the result is announced in open court, and no juror

registers dissent.").

In federal court proceedings, when a poll "reveals a

lack of unanimity, the court may direct the jury to deliberate

further or may declare a mistrial and discharge the jury." Fed.

R. Crim. P. 31(d).

Even if a jury is not polled, a juror could presumably

announce in open court his or her disagreement with other jurors,

thereby preventing a verdict from being final. The jury could

then be sent back to continue deliberations.

Hawaii law is similar. Rule 31(c) of the Hawaii Rules

of Penal Procedure provides:

When a verdict is returned and before it is
recorded, the jury shall be polled at the
request of any party or upon the court's own

> motion.  If upon the poll there is not
> unanimous concurrence, or there is not
> concurrence by the number of jurors
> stipulated to as being necessary for
> returning a verdict, the jury may be directed
> to retire for further deliberations or may be
> discharged.

The purpose of Hawaii's Rule 31(c) is to assure the court and the parties that a unanimous verdict has been reached and to give each juror the opportunity to indicate assent to the verdict in open court.  *See Hawaii v. Uyesugi*, 100 Haw. 442, 457, 60 P.3d 843, 858 (2002); *see also Hawaii v. Yamada*, 99 Haw. 542, 562, 57 P.3d 467, 487 (2002) ("Criminal defendants are entitled to a unanimous verdict under the Hawai'i Constitution and pursuant to court rule.").  As illustrated by *Hawaii v. Keaulana*, 71 Haw. 81, 83, 784 P.2d 328, 329 (1989), jurors in Hawaii courts have actually indicated during polling that verdicts reached were not unanimous, resulting in continued deliberations.  This demonstrates that even though the jury in the present case had unanimously agreed to acquit Gouveia and had informed the court that it had reached a verdict, that decision was not yet a final acquittal for double jeopardy purposes under Hawaii law, as jurors could still  have changed their minds.

Although not a case involving Hawaii law, *Durall v. Quinn*, 2007 WL 1574121 (W.D. Wa. May 29, 2007), is helpful to the present discussion.  *Durall* is a federal case flowing from a case in Washington's state court in which a jury deliberated and

informed the court that it had reached a decision.  Before the verdict was disclosed to the court, the defense alleged juror misconduct.  The court then held a hearing and decided to replace one of the jurors with an alternate because the juror had been told by a courthouse security officer the officer's views of Durall's credibility.  The verdict form was then sealed and later destroyed.  The jury, with an alternate, deliberated anew and reached a guilty verdict.  *Id.* at *10.  Durall sought habeas relief under 28 U.S.C. § 2254, arguing that the second verdict violated the Double Jeopardy Clause.  The federal district court noted that the last reasoned decision by Washington's state courts had determined that the jury's initial, sealed verdict was not a "final verdict" that terminated Durall's jeopardy.  *Id.* at *6.  The federal district court determined that that decision was reasonable and that § 2254 relief was unavailable because Durall had not shown an unreasonable application of Supreme Court precedent.  *Id.*

Similarly, the jury in Gouveia's case could have changed its mind at the time it announced that it had reached a verdict (and at the time the mistrial was declared).  Its verdict form indicating an acquittal therefore does not trigger double jeopardy protections.[1]

---

[1] This court need not address here the hypothetical situation in which a judge refuses to receive a verdict for an improper motive.  There is no suggestion that the judge presiding

33

### C. The Mistrial Was Not Supported By Manifest Necessity.

This court's analysis does not end with its determination that the verdict was not final. Gouveia additionally argues that the mistrial was not supported by "manifest necessity." This court agrees.

Hawaii state law provides that, "[w]hen circumstances arise that could influence the impartiality of the jury and thus affect the ability to reach a fair result based on the evidence, a rebuttable presumption of prejudice is raised" that supports a determination of "manifest necessity." *Gouveia*, 139 Haw. at 78 384 P.3d at 854. "To overcome such a presumption, the trial court, after investigating the totality of the circumstances, must find that the outside influence on the jury was harmless beyond a reasonable doubt." *Id.*

The Hawaii Supreme Court viewed the issue in Gouveia's case as being "whether the circuit court abused its discretion in finding that the presumption was not proven harmless beyond a reasonable doubt and no reasonable alternative to declaring a mistrial existed." *Id.* at 78-79, 384 P.3d at 854-55. That is, the Hawaii Supreme Court, determining that the jurors' concerns about the glaring man raised a rebuttable presumption of prejudice, applied a two-pronged test. First, it examined

_____

over Gouveia's trial had any improper motive.

whether the trial court had found that the outside influence on the jury was harmless beyond a reasonable doubt. Second, if the influence was not proven harmless beyond a reasonable doubt, it required the trial court to look at all reasonable alternatives to cure the harm before declaring a mistrial. *Id.* at 78, 384 P.3d at 854.

Although this court discusses the first prong of the above issue (going to the presumption), its focus in the discussion below is primarily on the second prong (reasonable alternatives to a mistrial).

As the Hawaii Supreme Court noted, upon receipt of the jury note concerning the menacing man, both counsel and the trial judge recognized the possibility of an improper influence and agreed that the jurors should be individually questioned. The Hawaii Supreme Court said:

> the jury communication in the instant case was a statement that the jurors were actually concerned for their safety, not merely inquiring into the possibility of danger. Additionally, at least four jurors stated that the discussions of the incident and potential danger happened at the beginning of deliberations, which indicates those discussions could have had an effect on the subsequent jury deliberations. Under these circumstances, the circuit court was well within its discretion to conclude that under the totality of the circumstances, the outside influence was not harmless beyond a reasonable doubt.

*Id.*, 139 Haw. at 80, 384 P.3d at 856.

This court does not agree with Gouveia that the state courts' presumption analysis is constitutionally flawed. The jurors agreed that the menacing man was discussed after the verdict was reached. But the jurors also generally agreed that the matter was discussed before the verdict was reached. At least three of the jurors indicated that the jury discussed the menacing man (the outside influence) as soon as they started deliberations. Ms. Wilcox, for example, stated that the man was discussed in the beginning for about five minutes. ECF No. 13-3, PageID #s 358-59. Ms. Hanashiro stated that the man was discussed as soon as deliberations started for about ten minutes. *Id.*, PageID #s382-84. Mr. Chandler told the court that the man was discussed early on for a minute or so. *Id.*, PageID #s 382-84. Ms. Chun similarly indicated that the man was discussed as soon as the jury went into the deliberation room, or possibly in the "early middle" of deliberations. *Id.*, PageID #s 430-31. Ms. Li also said the man was discussed in the "middle-early" of deliberations." *Id.*, PageID # 389. Mr. Valencia, unidentified Juror #7, and Ms. Kama each indicated that the man was discussed toward the end of deliberations. *Id.*, PageID #s 354, 394, 422, and 425. This means that eight of the twelve jurors remembered discussing the menacing man before the verdict was reached, with five of them indicating that it was so important that he was discussed in the beginning or in the early-middle of

deliberations.  Only four jurors (Ms. Boehm, Ms. Foster, Mr. Masuno, and Ms. Mau) indicated that the menacing man was not discussed until after the verdict was reached.  *Id.*, PageID #s 365, 373, 375, 411-12, and 417.

When combined with the jury's sending of a note indicating that the jurors were actually concerned about their safety, the jurors' indications that they discussed the menacing man during deliberation supports the finding that they may have been afraid for their safety while deliberating.  Ms. Wilcox, for example, said a few jurors were scared.  ECF No. 13-3, PageID 360.  Ms. Hanashiro said a few jurors were intimidated and concerned.  *Id.*, PageID # 386.  Mr. Valencia, Ms. Boehm, Ms. Foster, Ms. Li, Mr. Masuno, and Ms. Kama each said the jurors were concerned for their safety.  *Id.*, PageID #s 356, 366, 370, 374, 377, 392, 414-15, and 426.  Additionally, Ms. Kama testified that she thought the safety concern affected the jury's decision.  *Id.*, PageID # 426.  The trial judge "was well within [his] discretion to conclude that under the totality of the circumstances, the outside influence was not harmless beyond a reasonable doubt."  *Gouveia*, 139 Haw. at 80, 384 P.3d at 856; *see also Parker v. Gladden*, 385 U.S. 363, 366 (1966) (stating that defendant has right to be tried by twelve impartial jurors).

This court recognizes that there are problems inherent in accepting the trial judge's determination that the verdict was

tainted by the jurors' fear.  After all, a safety concern does
not automatically taint a verdict.  And here, there are specific
circumstances raising questions about whether the verdict was
tainted.

First (and most notable), the jurors voted to acquit!
To the extent they thought the glaring man was associated with
the prosecution, any fear they had would only have arisen with an
acquittal.  As it turns out, the glaring man was the decedent's
brother who would have only been upset with an acquittal.  *See*
Memorandum in Support of Section 2254 Petition at 3, ECF No. 2,
PageID # 12; Transcript of Proceedings (Sept. 6, 2013) at 59-60,
ECF No. 13-3, PageID #s 352-53 (indicating that decedent's
brother had shaved head and was upset while in courtroom).  That
the jurors voted to acquit is extraordinary evidence that they
were not affected by fear, as very clearly laid out by the
dissenting jurists in the ICA and Hawaii Supreme Court in
Gouveia's state court proceedings.

Second, while not all the jurors said that they
associated the glaring man with a particular party, those jurors
that did draw such an association thought he was favorable to the
prosecution and hostile to Gouveia.  Ms. Foster associated the
man with the prosecution and said she had a concern for her
safety.  *See Id.*, PageID #s 374-75.  Ms. Foster added that the
concern "was once the verdict was read, that maybe there would be

some retaliation against, you know, of us for whatever reason just being a juror." *See Id.*, PageID # 377. Ms. Li associated the man with the prosecution and indicated that there was "maybe a little" concern after the jury had reached a decision. *See Id.*, PageID # 392. Juror # 7 indicated that the man had directed his anger toward the defendant, not the jury, and was not concerned about safety. *See Id.*, PageID # 393. Juror # 7 indicated that one of the jurors wondered whether the man's anger might be directed to the jury "after everything's done." *See Id.*, PageID # 394.

Third, notwithstanding their expressions of fear, eleven of twelve jurors indicated that any such fear had no effect on their decision. Although the trial judge couched his determination as to the impact of the glaring man on what he called "credibility" findings, nothing in the record identifies facts supporting his finding that the jurors were not believable when they said that the man did not affect their decision. The trial judge makes no reference to any juror's demeanor. He just says, "It frankly beggars my reason and common sense that it would have no bearing on the deliberations in this case and therefore the verdict." ECF No. 13-3, PageID # 452. Whether this is a true "credibility" finding is unclear; it may instead be an assumption.

But this court sees no need to rely on these acknowledged problems with the conclusion that the jurors were affected.[2]  To this court, the more conspicuous problem is that there was a readily available alternative to a mistrial.  *See Arizona*, 434 U.S. at 514; *Sanders*, 591 F.2d at 1296; ECF No. 13-3, PageID # 176.

State law on reasonable alternatives in the double jeopardy context does not diverge from federal law in requiring an examination of reasonable alternatives to a mistrial.  Indeed, the Hawaii Supreme Court expressly recognized the need for the trial judge to have considered alternatives in Gouveia's case.  The Hawaii Supreme Court, noting that the jury had reached a verdict and notified the court that there was a concern about juror safety, held, "Under these circumstances, the circuit court determined that the verdict was already tainted and that neither a continuance nor additional jury instructions to ignore the

---

[2]The majority in the ICA's *Gouveia* opinion notes in a footnote that, because Gouveia did not argue in either the trial court or the ICA that the trial judge had "erred in failing to consider options less severe that mistrial," the ICA had "no basis for concluding" that the trial judge had erred in that regard.  2015 WL 2066780, at *10 n.5.  This court nevertheless examines whether the trial judge had options short of a mistrial. While cognizant that the ICA statement might raise a possible procedural default issue, this court is relying on the Hawaii Supreme Court opinion that makes clear its understanding that the issue of alternatives to a mistrial was indeed before it.  The Hawaii Supreme Court's majority opinion in *Gouveia* includes a section headed "No reasonable alternative to a mistrial would have eliminated the potential of prejudice."  139 Haw. at 80-81, 384 P.3d at 856-57.

outside influence would have been effective. This determination was reasonable." 139 Haw. at 80, 384 P.3d at 856.

The problem this court identifies with the Hawaii Supreme Court's conclusion in this regard is that it is based entirely on the trial judge's statement that "there is no other remedy short of a mistrial to cure the issue at hand as neither a continuance not a further jury instruction would appropriately address the issue of an impartial jury and its subsequent tainted verdict." *See id.* at 79, 384 P.3d at 855. Nothing in the record suggests that either the trial judge or the state appellate courts considered any possible instruction at all. The trial judge made an assertion unaccompanied by explication of any sort, and the state appellate courts accepted the assertion without really examining it.

The admonition that all reasonable alternatives be considered requires more than an assertion. Finding a manifest necessity is a hugely consequential matter that requires a more searching process. Otherwise, the "reasonable alternatives" prong becomes meaningless. It becomes a foregone conclusion that there is no reasonable alternative once the prejudice is not rebutted. In fact, at one point the Hawaii Supreme Court suggested as much, saying that "the circuit court was well within its discretion to conclude that manifest necessity existed for a mistrial because the presumption of prejudice was not overcome

beyond a reasonable doubt." *Id.* Although the Hawaii Supreme
Court then went on to note the need to examine reasonable
alternatives separately, that discussion was cursory and nearly
pro forma, consisting primarily of accepting the trial judge's
statement that no reasonable alternative existed. While there
are undeniably situations in which there is no reasonable
alternative to a mistrial (and this court confesses to having
determined that itself in a trial), something more than the
existence of prejudice is required for a mistrial.

Citing *Hogan v. Dunkerley*, 579 F.2d 141 (2d Cir. 1978),
the Ninth Circuit in *Sanders* said that a mistrial cannot be said
to have been manifestly necessary when a trial judge has failed
to adequately consider alternatives to the mistrial. *Id.* at
1299. In the Second Circuit's *Dunkerley* case that the Ninth
Circuit relied on, the trial court had *sua sponte* declared a
mistrial over a defendant's objections after learning that the
defendant had to be hospitalized for seven to ten days because of
a collapsed lung. 579 F.2d at 143-44. The Second Circuit,
noting that such continuances were "commonplace in many
jurisdictions," held that, because the trial court had not
explained why a continuance was not feasible, there was no
manifest necessity to declare a mistrial. *Id.* at 147-48 (stating
that "the apparent availability of at least one alternative to a
mistrial," specifically, "adjourning the trial for 7 to 10

days[,] leads us to conclude that a mistrial was not a 'manifest necessity'"). Under both federal and Hawaii law, if a reasonable alternative to a mistrial existed that adequately addressed the potential of prejudice, double jeopardy protections now prevent Gouveia's retrial.

This trial judge is hugely sympathetic to the dilemma facing Gouveia's trial judge at the time the mistrial was declared. The trial judge acted deliberately, taking care to consult with counsel and to hear from each juror. He then concluded that nothing short of a mistrial could cure the effect of the menacing man, and the Hawaii Supreme Court agreed. But there was at least one "commonplace" thing the trial court could have tried before reaching that conclusion. This "commonplace" measure, if successful, would have preserved Gouveia's right to have the charges decided by the first jury empaneled.

Critical to the availability of this remedy is the status of the "sealed verdict" as not "received" or final. That status meant that the trial judge could have done a brief investigation into the glaring man and could then have called the jury back into court and assured the jury that his inquiries caused him to conclude that the jurors' security was being properly addressed or that there was no safety threat. For example, the trial judge could have told the jury that the court had identified the man with the shaved head who was whistling and

glaring.  Even if this required a short continuance, the trial
judge could have told the jury that he or security officers had
admonished the man and concluded that he posed no safety risk to
the jurors now or in the future.  The trial judge could then have
sent the jurors back into the deliberation room to continue their
deliberations armed with these assurances.  He could have told
the jurors that they could reach the same result and even use the
same verdict form if, upon further deliberation, they came to the
same conclusion, while also providing a blank verdict form for
them to use in case they changed their decision.  This would have
been similar to the trial judge's initial plan to talk to the
jurors about the incident after receiving the verdict.  *See* ECF
No. 13-3, PageID # 349.

Trial judges often, upon receipt of jury questions,
address jury concerns and questions in open court before sending
the jury back to deliberate.  In *United States v. Ivester*, 316
F.3d 955 (9th Cir. 2003), jurors had communicated while evidence
was being presented that they were concerned about the lack of
security in the courtroom, given the large number of scary-
looking people in the audience.  The jury was told in open court
that many of those people were actually United States Marshals in
plainclothes and that the jurors should not be concerned for
their safety.  The jurors ultimately found the defendant guilty,
and the judgment was affirmed.

As noted earlier in the present order, the verdict in Gouveia's trial was not final.  This means that the trial judge still had an opportunity to remedy the situation.  In declaring a mistrial without even considering the lesser, "commonplace" action of alleviating the jurors' safety concern through information and/or instructions, the trial judge committed a constitutional error.  The record does not show why the preceding "commonplace" cure could not have entirely addressed any harm.

There were, of course, other possible alternatives.  Had the trial judge been concerned that the outside influence might have caused the jurors to return a guilty verdict, as it appeared that the man was threatening Gouveia, the trial judge could have adopted a bifurcated procedure.  Before looking at the verdict, he could have said that, if the verdict was guilty, he would declare a mistrial because he could not say beyond a reasonable doubt that the influence of the man was not harmless, but, if the verdict was not guilty, then he would receive the verdict because the influence would have been harmless beyond a reasonable doubt.

This court is at pains to avoid simply disagreeing with the trial judge's determination that there was nothing short of a mistrial that could have remedied the menacing man's influence on the jury.  Well aware that actions contemplated after the fact may not fall within what is reasonably considered at the time,

this court has focused its attention on what is "commonplace." Given the importance of Gouveia's federal double jeopardy rights, the court is simply unable to ignore an obvious, "commonplace" cure that was clearly available to the trial judge in light of the nonfinal nature of the verdict. At the very least, reasonable alternatives had to be considered, not declared unavailable out of hand. Under these circumstances, this court rules that the trial judge violated Gouviea's double jeopardy right in declaring that a mistrial was supported by manifest necessity. Gouveia may not be retried for manslaughter in violation of section 707-702(1)(a) of Hawaii Revised Statutes. *See United States v. Jorn*, 400 U.S. 470, 487 (1971) (stating that double jeopardy prevents retrial when trial court abuses discretion in declaring mistrial).

## VI.        CONCLUSION.

The court grants Gouveia's habeas petition under § 2241, ruling that his federal right to be free of double jeopardy will be violated by a retrial under the circumstances presented here. The Clerk of Court is directed to enter judgment in favor of Gouveia and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 25, 2017



/s/ Susan Oki Mollway
Susan Oki Mollway
United States District Judge